Mr. Chief Justice, and may it please the Court, this case is not complicated. The Wisconsin Supreme Court got it wrong when it interpreted a state law religious exemption to favor what it called typical religious activity, and when it held that helping the poor can't be religious because secular people help the poor. To resolve this case, this Court need do nothing more than say that the Constitution doesn't allow courts to do that. That conclusion breaks no new doctrinal ground, and most courts have no difficulty applying religious exemptions constitutionally. The problem here is that Wisconsin draws distinctions along theological lines, something that this Court has repeatedly forbidden. Wisconsin compares its rule to the ministerial exception, but Wisconsin's rule would be equally unconstitutional in the ministerial exception context. No court would hold that clergy who preach on Saturday are not ministers because preaching on Sunday is more typical. Nor would any court hold that a religious leader who helps the poor isn't a minister because secular leaders help the poor, too. By that measure, Mother Teresa might not qualify. In short, there is nothing wrong with the statutory text here or with how most legislatures and courts deal with religious accommodations. The problem is how the Wisconsin Supreme Court applied the religious purposes exemption. I welcome the Court's questions. Can the state impose any limits on exemptions for religious organizations? Absolutely, Your Honor. We're asking only here that they not discriminate along theological lines. So we're not saying that if you have a religious motivation, you get a religious exemption, no matter what the issue is. What we're saying is once you have an exemption in place, then the Constitution requires you to apply it even handily. Well, wouldn't that be problematic if various religious groups set themselves up differently? Some incorporate, some don't. You make a point that you are required canonically to have a different organization from the diocese itself. Some organizations, religious organizations, may not have that requirement. So can the state make any distinctions between different organizations, religious organizations? I think that they can. I do think that there are constitutional guardrails to that. I don't think this case presents those because this is a case about an existing religious exemption and whether that is applied even handily or selectively. In our view, both the Larson case and the Lucumi case say that selective enforcement or application of a religious exemption is a problem. Larson, in particular, says that... Well, maybe the same kind of question that Justice Thomas raised. But even within this given religious exemption, are you saying that there can be absolutely no distinctions? In other words, that any group that comes in and says we are a religious group doing religious activities for religious purposes qualifies, sort of no matter what? That there's no looking behind that at all? No, I think, for example, this particular exemption is also, there's a separate requirement which isn't disputed among the parties about whether Catholic Charities is controlled by a church. So that's sort of another condition precedent to getting this exemption. And we don't see a problem with that particular kind of limitation. So I think, I want to be very clear, we're not here to say, you know, limitless exemptions. What we're saying is that... Totally, but I think what Justice Thomas's questions, my questions are just, you know, is there a line someplace even if you fall on a side of the line that you want to fall on? Right, I think once you're inside the exemption, there's obviously a requirement that it be sincere. And I think also there's a requirement that it be, say, religious, not philosophical. But other than that, I do think that there has to be, you know, at that point you probably do need to start treating the different groups equally. What if you have a religion that thinks it's a sin to eat meat? And they, to promote eating of non-meat dinners, they open a restaurant. But it's only vegetables and, you know, non-meat. Do they have a claim to be exempt from state taxes, food taxes, everything else? Because that's a sincerely held belief and it's important to them. And you're going to be taxing them, you're going to be taxing the exercise of their beliefs. So I think it depends on whether the statute that's, you know, imposing the tax says, you know, this applies to meat-eating people or not to meat-eating people. That's what we have. It just applies across the board. And they claim an exemption from it because this is a part of their religious exercise. I don't think that's, I don't think that that would be, they would necessarily have a claim there. Because it's not something where the religious organization is being discriminated against along theological lines. That is, there's a rule across the board. Now, I do think, with respect to the claims that we've made in this particular case. Now, of course, let's say it's like Lukumi, where very similar issues came up with respect to ritual slaughter by Santeria priests. And the court found, no, you don't actually get to make these kind of, you know, you don't get to gerrymander it so that only certain groups are not allowed to, you know, do animal slaughter. And in Lukumi, of course, there was both secular allowed slaughter but also religious. So there was a carve out for kosher slaughter as well as slaughter for other reasons in Lukumi. So that's what we're talking about with the selectivity in this case. So can I just be clear on your argument because I'm just wanting to understand it. It sounds like you are saying that to the extent the state has chosen to exempt religious groups, the line that they are drawing divides Catholic charities which don't perform certain quote unquote typical religious activities with respect to their charity. And other kinds of religions which may evangelize, proselytize, or whatever. Is that the discrimination between Catholic charities and charities run by other kinds of churches that you are focused on? That's right, because this is just within the religious exemption that already exists. And they're disfavoring Catholic charities because they serve non-Catholics, because they hire non-Catholics, and because they have, they don't proselytize. So let me just ask you, I mean I totally see that and I do think that it raises at least the neutrality problem that you're talking about. I'm wondering if the exemption was actually designed to work that way and whether Wisconsin may be at least, and obviously they have the right to say whatever they want about their state statute, but to the extent that they're following the federal law. I wonder whether for religious purposes isn't really about the motivation. That instead it is about the kinds of activities that the organization undertakes. And so when we look, for example, at the legislative history of the federal provision, they're very clear in terms of making the line be between a college devoted to preparing students for the ministry, a novitiate, which I understand is sort of a place for people, nuns and the like, to decide whether or not they're meant for the faith, or a house of study training candidates to become members of religious orders. They put that on one side of the line. Congress does. And then it says, on the other hand, a church-related, separately incorporated charitable organization, such as an orphanage or home for the aged, would not be considered. So it seems to me that the line, at least in the federal statute, is not between charitable organizations that proselytize versus charitable organizations that don't. Instead, it's all charitable organizations on one side that are run by the church, and organizations run by the church that are like training programs for priests, that are like religious in that way. Now, for you, that would be a little unfortunate, because it would take you outside of the exemption. But I'm just trying to understand whether for religious purposes is really about the motivation, or are they trying to get at those organizations that are inculcating or training religious doctrine. So I think it operated primarily for religious purposes. The best reading of that is to say, is it the meat-free restaurant that's just sort of run out of the temple basement, or is it sort of a separate business? So there's a separate part of the Internal Revenue Code, Section 513 of the Internal Revenue Code, that talks about unrelated business income. And there's a carve-out for all charitable organizations if they have a sort of separate thing. I think that the operated primarily for religious purposes means that you're not operated outside of that. You're not operated as a sort of for-profit business that's owned by a church, of which there are many around the country. Those entities don't get the exemption, even if they are controlled by a church. Because remember, there is also that other condition that the entities that enjoy this exemption are controlled by a church. Could you focus on Justice Jackson's question? Is there a difference in your mind – and Justice Jackson, you can correct me – is there a difference in your mind between this law and the IRS law that she identified? And what is that difference? I think that's what she was getting at. She thinks the two laws might be the same. Are you seeing a difference, and if you are, how do you articulate it? Well, I think that the way – the law that she's talking about is the FUTA, which we would say that that language is not – that text is not really problematic there, but the way that the Wisconsin Supreme Court interpreted it here to have that list. Yes, I see that language. Right. She was talking about the laws in the IRS. No, no, I was talking about the FUTA. Oh, I'm sorry. Yes, but what I'm really kind of focused on is the example in the legislative history that puts church-run charitable organizations like an orphanage or a home for the aged outside of the exemption. And that troubles me because it seems as though you're saying that should be in, and it shouldn't be distinguished between orphanages that proselytize versus orphanages that don't. And I guess I'm just wondering whether any orphanages are in, given the way this statute is written. Yeah, I don't think that that's the right reading of it. I mean, to the extent that legislative history does control the way that you interpret the text, I would say that you would really need to have a sort of constitutional avoidance approach to it. I don't think that Larson, for example, says that you need to have a broad reading of statutory religious exemptions. And so I think you would need to have constitutionally read FUTA to be pretty broad and cover things like orphanages. Let's say Catholic Charities owned an orphanage. They don't. You're saying the Constitution requires an exception? No, I'm saying that where it's excluding it on the basis of religious exercise or theological lines, then that would be a problem. There, I think the difference is that most of these exemptions, you're trying to alleviate burdens on religious exercise. And this Court has repeatedly said in cases like Amos and Cutter that that does not constitute discrimination. Counsel, can I ask you a question about the church autonomy doctrine? So it seems to me that there's a difference between telling a church what to do or interfering in its internal affairs and incentivizing the church to do certain things. Do you see a distinction between those things? Well, I think that there is a distinction between the two things, but I think this Court has said, for example, in the Kedroff case, that it's control or manipulation. So that the incentivization part of it, I think, would also be covered. To the extent that the power to tax is the power to destroy or things like that, I think it really matters what the incentives are. Okay, well, you talk about the organizational choices that the Catholic Church has made in treating Catholic Charities as a distinct corporation, a distinct entity from the diocese itself, while a nonprofit corporation is distinct from a for-profit corporation. The Chief Justice asked you about a restaurant, you know, that's an outreach that serves vegetables. Well, what about a for-profit versus a not-for-profit? What if a church believes that raising money, either for the benefit of members or to give away or whatever, is essential to its religious mission and wants to be a for-profit organization? Would it violate the church autonomy doctrine for an exemption to be offered only to nonprofits? I don't think so, Your Honor. I think that the difference here is that we've got different parts of the same church body that are either exempt or not exempt. So we have a sort of patchwork where the parent, so to speak, the Diocese of Superior, is exempt. Then one of the sub-entities of Catholic Charities, which is sort of two layers down, is also exempt. But for purposes of the church autonomy doctrine, I guess, you were focused on the organizational structure of the Catholic Church and the diocese and its outreaches. And I'm wondering why your theory of the church autonomy doctrine and how it applies here would not extend pretty broadly. I think you can limit it to situations where it's part of the long-term governance and there's a sort of discrimination among different kinds of governance. This is sort of explicated in the— But what about my for-profit, not-profit example? I guess I just don't—maybe I'm misunderstanding the question, but I'm not seeing how that is the same as the church governance itself and how the different organizations are set up. Okay, let me ask you another question. One of the problems here is figuring out what the line is. If a legislature wants to, like Justice Jackson is saying, exempt certain kinds of religious activities but not others, and you point out that it's excessive entanglement in your view to try to distinguish between—to get involved in the enterprise of figuring out what you're up to, what about the ministerial exemption itself? It requires that kind of distinguishing. I mean, is it excessive entanglement for a court to figure out who is a minister? No, not at all. I think the difference is the way that the Wisconsin Supreme Court decided this case and said, you know, if you're a minister—sorry, if you're doing something with one kind of theological set of presuppositions, you get better treatment, you're favored, and if you're not, then you are disfavored. And I think if you have something that's across the board, you're just looking at is this religious, is this not religious, that's the kind of thing that courts decide every day. They decide all the time whether a particular activity is religious or a particular person is acting on religious bounds. So I want to be very clear. We're not saying there's any problem with trying to decide if something is religious or not. What we're saying is that there are limits on what you can do within that question, and one of the things that you can't do is discriminate along theological lines. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? When you say that Catholic Charities does not proselytize, are you using that term in the ordinary sense, or are you using it as a term of art? I would say it's used as a term of art for the Catholic Church, that you don't proselytize. And what does it mean? What does that term of art mean? Well, what it means in the Catholic Church is that you're, for example, saying, here's your food, but if you want the food, you have to come to Mass, or I need you to come pray with me, or something like that, or you need to convert at the sort of most extreme end of that. But it doesn't mean that you can't, Catholic Charities can't evangelize. Is that right? That's right. In Catholic teaching, there's a distinction between evangelization and proselytization. Evangelization is okay. Proselytization is not okay. And what is the difference? The difference is the sort of almost coercive effect, or the sort of using it to influence people and kind of take advantage of them, exploit them. And that's proselytization. Evangelization is really the idea of sharing one's faith, sharing the Catholic faith with someone else to help them understand what someone believes. It doesn't mean that Catholic Charities could not say to participants in its services, if you would like to pray, here's an opportunity. If you would like to go to Mass, here's an opportunity. If you would like some religious reading, here is something that we have available. So within the Catholic Church, that's not a problem. I don't want to get into a theological discussion, but I'm asking these questions because if you're making a religious discrimination claim, you've got to have a comparator. So what's your best comparator, with this in mind? You're saying here that the Wisconsin Supreme Court is discriminating against Catholic Charities. It would treat other religious charities differently, right? Yes. So what is your best comparator of a religious charity that would be treated favorably by the Wisconsin Supreme Court? Well, let's say you had a, you know, I don't want to pick on any particular denomination, but let's say you had a Baptist Church that said, you know, we're going to give you food, but before that we would like you to attend this church service. Or, you know, said, well, another group might say, we're only going to serve our particular group. Now, I think it's really important that it has to go both ways. That is, I don't think that Wisconsin should discriminate against people that do proselytize either. The point is that they made the distinction along that theological line that has nothing to do with that. So that to me is the difference. The decision to organize Catholic Charities as a nonprofit corporation was done for religious reasons and not for practical reasons? Well, I guess I would say that the two kind of coincide. That is, how can you be a more effective mission? And definitely you can be a more effective mission if you're both incorporated and are organized as nonprofit. But there's not a teaching of the Catholic Church that says that you must always and everywhere organize as a nonprofit. Thank you. Justice Sotomayor? Two questions. One, the government asks us to reverse, not on a constitutional ground, but on the Wisconsin courts' misinterpretation of its own statute. Do you have a position on that? And then number two, it seems to me that all your arguments, both on autonomy and entanglement, all come down to the discrimination claim. But if Larson and City of Hialeah, that doesn't end the inquiry, meaning if a state discriminates, it might be entitled to. And you have to apply strict scrutiny. In those two cases, we affirm because there was evidence of invidious discrimination. There's no evidence of that here. So what do we do? Vacate and remand? Okay. If we find that there's discrimination, then what guidance do we give? So answer the first and then the second. Sure, yes. And I apologize. I hope I get all the subparts there. On the solicitor general's argument, I think, you know, we obviously will take a win on any basis. We're not going to reject that. But it doesn't seem apparent from the face of the opinion below that they were feeling bound by the federal law in this case, and that really is the standard under three affiliated tribes and the other ones. I guess the second issue that we see is that this could just result in sort of a do-over where it goes back down to the Wisconsin Supreme Court. Wisconsin Supreme Court says, okay, you know, we're eliminating all mention of the federal law. We're just interpreting Wisconsin law here, and, you know, we're back here in a couple of years. Obviously, my clients wouldn't like that, but also I don't think that's Why don't you go down to the second question? Okay. So then the second question, I would say, is just that on strict scrutiny, I think it's just very hard for I don't think you have to remand for that. I don't think that they put on much of a strict scrutiny case. The only interest that they put forward below was whether, you know, broad access to getting unemployment benefits. And there's so many different exceptions to that, just like in Lukumi, just like in Larson. And I think that there's also no risk to the FISC of Wisconsin because only 0.6 percent, as put in one of the bottom-side amicus briefs, of workers are with religious organizations. So it's just they don't have the interest, and they're very under-inclusive and have lots of exceptions, and that defeats strict scrutiny. I agree with you, but what do we do with It is a compelling state interest not to be entangled in church, in a church. So that itself is a compelling state interest. Do we say it fails strict scrutiny not on the interest prong, but on the narrow tailoring prong? You said there's so many exceptions, et cetera, so it's more like a narrow tailoring. I think you could definitely do it on that basis, and this Court has done that in many religion cases where it said we're just going to skip over the compelling interest part and just get straight to the narrow tailoring. Justice Kagan? Mr. Rathbuck, I had understood your autonomy argument as different from your discrimination argument. In other words, your autonomy argument is essentially that the way this statute, as understood by the Wisconsin Supreme Court works, is it puts pressure on the church to organize its charitable activities at the diocese level rather than the way it's done now, because at the diocese level they surely would be entitled to the exemption. So it's not the most obvious thing that stands out about what the Wisconsin Court has done here, you know. And I'm just wondering why you led with that argument. I mean, why you think it's your strongest one, or why you, you know, I take it if you lead with it, that's the one you most want us to rule on. Maybe I'm wrong about that. If I'm right, why? So I don't think that we wrote the brief saying that all three, that they're ranking it that way. So I definitely, I think all three arguments are valid. You can rule on one, you can rule on two. I'd be very surprised if you ruled on all three. But we were not meaning to rank them by the order that we put them in the brief. Okay, why do you think that, you know, that would be a good choice? Well, I think, you know, in some ways the church autonomy argument would be sort of a very simple thing to just say, look, you're, you know, this is a single church body, and they're all controlled by a single bishop. It doesn't make any sense to try to force them to reorganize, and it's sort of senseless to say that, you know, both the sort of top organization and one of the, you know, two ranks down sub-entities are exempt while excluding everybody else. So that, you know, it would be a kind of very simple decision, and I think one that you could limit to this particular context. But that's really, you know, what we would be, what the argument would be with respect to church autonomy. Thank you. Justice Gorsuch? Mr. Rosbach, I guess I have a similar question to Justice Kagan. I would have thought the simplest argument of the three you chose was the discrimination argument. On the face of the decision below, the court distinguished between religions that proselytize and those that don't, and between those who serve co-religionists and those who serve others as well. Why isn't that the simplest basis on which to rule? Sorry if I misspoke when I was having the colloquy with Justice Kagan. What I meant to say is it's a relatively simple kind of decision, but I don't think it's the simplest. I do think the simplest is probably the discrimination argument, and, you know, the court can just hold that the Wisconsin Supreme Court's interpretation of the religious exemption violated Larson and Lukumi by discriminating along religious lines, and I think that would be enough to decide the case. That would break no new ground in our case law. Correct. And then when it comes to the compelling interest, what compelling interest might a state have in distinguishing between religions on that ground? I do think it would be difficult. I think this court had a footnote in Trinity Lutheran, and I may be getting that wrong, that referred to McDaniel against Patey in an earlier case that talked about the fact that there may not be a strict scrutiny defense to sort of a pure discrimination among religions. Right. And is it further complicated by the fact, an effort to survive a compelling interest, complicated by the fact that the Catholic Charities apparently has an unemployment benefit system that is comparable to the states? That's exactly right. You know, we think actually for the workers at Catholic Charities it will be better for them to be on the church plan. Certainly they get their benefits much more quickly from the church than they do from the state when they ask for unemployment benefits. But also it enables us to show solidarity with our other dioceses in the state. Thank you. Justice Kavanaugh? I wasn't quite sure of your answer to Justice Jackson. If Catholic Charities ran an orphanage or a home for the aged, what result? I think it would be treated like their current ministries, like a housing ministry or other things. So I think that that language in the legislative history to the extent that it then got transposed into Wisconsin law and was seen to say, you know, orphanages are out. I think that would be a problem because there's nothing in the law itself that says that, you know, the text of the law that says that you can't have an orphanage. So to the extent that reflected an understanding at the time, that understanding is simply inconsistent with the statutory language. Is that the answer? Yeah, I think the answer is just that statutorily I think that would be very hard to do. And I think, as I was trying to make out earlier, that there's a constitutional avoidance problem there too. If you create these sets of approved religious, you know, judicially approved religious activities, that's a real problem. You know, this court has identified them in cases like Hosing a Tabor or Our Lady of Guadalupe, but it was very clear not to say that that's a closed set. It's an open set and that other kinds of activities or things might be in there. Obviously, you know, ministerial exception is a little bit different because it's talking about these important religious functions within the body. But religious, you know, the set should not be closed by the judges. The judges should not close it. And I think your answer is getting at another question I have is, the other side relies on the phrase distinctively religious activities. I just want to make sure you can respond to the use of that phrase. Yeah, I just, I think it's, you know, six and a half dozen of the other. You know, if you look at the opinion below, they consistently talk about, you know, it's wholly secular endeavor, it's not religious in nature, it's secular in nature. And then they rely repeatedly on the list from the Dykema case from the Seventh Circuit in the 80s. And, you know, they've come up with a little list and they're saying that this is the closed list and we're outside the list. Whatever, you know, they say, oh, it's just an illustrative list in the opinion, but we're still out. You know, what we're doing clearly is not on the list. Whatever other things might go on the Wisconsin Supreme Court's list, we're not on that list. You know, helping the poor or helping the elderly is not on the list. There's no limit on that. To go to the other side is what, again? Sincerity is one limit. But what else? Is there any other limit to the Chief Justice? I would say that's probably the main limit is it's sincerity. Is it the only limit? Well, I would say also religiosity, but in the sense of religion versus philosophy. So this is the thing that actually comes up in the Yoder case where the court makes a big distinction between what the Amish were doing and what Henry David Thoreau was doing. And it said, well, you know, there's special solicitude under the First Amendment for religion, and the Amish get that, but Thoreau doesn't, even though he felt very strongly about his opinions. Thank you. Justice Barrett? I want to pick up on Justice Kavanaugh's question. So you agree that there has to be some way of separating out religiosity from non-religiosity? That's right. Okay. And is your answer to Justice Kavanaugh that if we articulated a test for that, it's sincerity of belief primarily and then this Thoreau distinction between religiosity and someone who simply says this is just a philosophy? Sure. And I think you can kind of put a little bit more meat on the bones there by thinking about, you know, what is religion? I don't think you have to answer the question. It's not a big question. It is a big question, and it's a fascinating one. I think if you go back even to, like, the Virginia Declaration of Rights, you know, it says the duty which we owe to our creator and the means of discharging it, and then Professor McConnell, you know, sort of extended that a little bit more broadly to just this idea of transcendent binding truth. Because the problem that comes up in these issues for religion and the law and why it is important what religion is for the law is conflicting obligations. So if you go to Madison's memorial in Remonstrance, you see there's this conflicting between the obligations of God and the obligations of the government. And, you know, Madison says, you know, you have to navigate that. So I think you have to be able to see that things are religious or not because you look at whether there's a transcendent truth at it. Well, does all religion have to have a transcendent truth? And it's not always about a clash of obligations, right? I mean, because here there's not a clash between what Wisconsin is demanding and what Catholic Charities is giving. Wisconsin's not requiring Catholic Charities to do anything, so it's not like a conscience exemption kind of case. This isn't like the Catholic hospital being told that it has to provide abortions. This is distinct. This is a benefits case. So I guess, let's see, let me just backtrack from the philosophical question. Can you give me, like, what would an opinion say? I mean, we're not going to talk about philosophy in an opinion, right? So if we had to articulate a test to distinguish religion from non-religion, can you concisely tell me what that test would say? I think I would say that it's a duty that is owed and the means of discharging it. Here we do have a duty that we owe as Catholic Charities. And that's a uniform test, not just for Catholic Charities. I think you can really apply it across a lot of different situations. Now, what a lot of people, scholars and others have commented is that 99% of the time it's going to relate to what you think God or gods is telling you to do. There are some non-theistic religions, forms of Zen Buddhism. But the overall thing is that there's something transcendent, supernatural, that you are feeling obligated by, and that's the distinction. Thank you. Justice Jackson? Let me just give you a hypothetical so I can try to understand your constitutional point. So suppose we have this federal exemption from the unemployment scheme. And I'm just reading the text of the exemption. In the employee, you don't have to pay the tax. If you are in the employee of an organization operated primarily for religious purposes and operated, supervised, controlled, or principally supported by a church, et cetera. That's the text of the statute. Suppose the Wisconsin legislature said, you know, we really don't want to get into the business of trying to figure out who is religious versus theory versus whatever. We think that that's problematic from our perspective. So what we want to do, this is the legislature, is define in the employee of an organization operated primarily for religious purposes, we're going to say an organization that is operated for primarily religious purposes is a college devoted to preparing students for the ministry, a novitiate, a house of study training candidates to become members of religious orders. That's what we mean when we say, when the statute says, you know, for religious purposes. So no orphanages, no soup kitchens, no any of that. Whether you proselytize or not, we don't care. We're not getting into that. We just have a very, very narrow exemption for certain kinds of religious organizations as we've defined them. Is that constitutional or not? I think two parts to that. One is it does depend a little bit on the history before. So if, like, let's say this went back and the Wisconsin legislature changed it, then you would be in a situation where you would be out of it. I understand. But even our current exemption, I understand for years the Catholic charities didn't seek this exemption. So this is like a new thing. So now the legislature is saying, okay, what we'd like to do is only give this exemption to the novitiate, the ministry, college, that's it. No restaurants run by vegan ministers, none of that. Can they do that consistent with the Constitution? I think that would probably go too far. I think that some, if it's designed to alleviate a specific burden, sure. If it's just designed to. It's designed to keep the legislature and the state from kind of like the ministerial exception, adjudicating unemployment tax claims with respect to those kinds of institutions. Because if we get into it with those kinds of institutions, we might have the same kinds of problems that the Supreme Court has identified for the ministerial exception. But we don't get into those problems if we're talking about unemployment for a restaurant owned by a vegan minister. So we just want to focus in on those kinds of institutions. Can they do that? I just don't think that you can decide. I don't buy the premise that you would say, first of all, that it would be less entangling. I would see that as much more entangling because then you'd have about 15 cases about what's an officiate. Is this thing closer to an officiate, et cetera? So I think that would be very entangling rather than de-entangling. Thank you. Thank you, Counsel. Mr. Gannon. Mr. Chief Justice, and may it please the Court. Wisconsin has opted into the cooperative framework of the Federal Unemployment Tax Act and has enacted the federal statute's exemption for religious employers, which applies to certain church-controlled organizations that are, quote, operated primarily for religious purposes. Petitioners serve as the social ministry arm of a diocese of the Catholic Church. They correctly told the Wisconsin Supreme Court that they qualify for the exemption under the statute. That court erred in its reading of the statutory text, and because it explained that the Wisconsin statute conforms with the federal one, this court should correct its mistake. That would avoid serious constitutional questions, just as this court did when it construed FUTA's religious employer exemption in St. Martin in 1981. If the court reaches the constitutional question, it should reject the Wisconsin Supreme Court's analysis, which second-guesses the religious nature of sincerely held expressions of faith and, worse, risks discrimination among various faiths by singling out certain activities that are deemed inherently secular. I welcome the Court's questions. You seem to prefer the statutory argument. What would be the problem with deciding this on a constitutional basis? Well, I think that we do agree that the statute would be unconstitutional as applied. I would prefer not to have what I think is the sensible reading of a federal statute be declared unconstitutional by this court. We think the better reading of the statute is the one that the Wisconsin Supreme Court rejected, and we think that there's no doubt here. There hasn't been any debate here that if it were construed our way, nobody is alleging that that would be unconstitutional. And so I would prefer that sort of saving construction that would avoid the need for the court even to say that, assuming the Wisconsin Supreme Court were correct about construing this verbatim language that comes straight from a federal statute, that you're going to grant them, you're going to spot them their interpretation, which we think is counterintuitive, and then go on to decide constitutional questions. We don't think that the constitutional decision would need to be incredibly complicated. Multiple particular grounds have already been discussed today. Some are easier than others. What would happen if the Wisconsin Supreme Court stood by its reading of its statute? If it stood by its reading of the statute, it would have to back away from the parts of its opinion where it said that the Wisconsin legislature was intending to conform the statute with the federal statute, and it would also perhaps be dismissing the suggestion from this court that that actually raises serious constitutional questions. It would have to sort of double down. So in other words, we'd be where we are now. You could be where you are now, but I do think that the Wisconsin Supreme Court deserves to know that it was incorrect about the fact that it thought that it was conforming the state law with the federal law, and that's exactly what this court said in St. Martin when a very similar question was presented about whether schools were covered by this exemption. Well, I appreciate it, Mr. Gannon. You're supposed to, as Solicitor General, sort of protect federal statutes, and, you know, if you think this one is okay, I get the point. But is there nothing in addition to that? I mean, are you worried about certain kinds of constitutional questions, about the difficulty that they might raise? If you think they're easy, your argument to do it on a statutory basis becomes less forceful. So are they easy? Are they hard? You know, frankly, I think the bottom line is easy. I think, like, deciding what the ultimate limit on any of these particular theories here could get complicated. And so I do think that there are serious constitutional questions about each of the arguments that have been raised. Which is your preference of those arguments? Which do you think is the easiest, the simplest, the least likely to lead to complications? I mean, I think that probably the discrimination argument is the— but also, I mean, frankly, I think that the second guessing, what counts as inherently religious, is just something that courts shouldn't be in the business of doing. And so that's a problem for a court to be defining what is inherently religious, what types of activities are inherently religious. And we think that it flies in the face of the statute. The statute clearly says you should be looking at what is the primary purpose of this organization. And we think that certain activities, it makes all the difference why you are doing them. That determines whether they are being done for religious purposes or not. As this court has said, you can grow a beard, or refrain from eating certain foods, or drink tea for a different reason. It makes all the difference about whether it's religious or not. And one of the things— How would you answer Justice Barrett's question? You know, if we go this route, you know, what counts as religious? I mean, nobody likes, no judge likes to say, I'm sorry, you're not sincere here. So sincerity is, you know, a pretty high bar. Yeah, and that is, we think that there hasn't been any doubt here. I mean, first of all, I think that the statutory reading, I think, makes that a much easier argument because nobody is disputing here. The court below, and I understand my friend on the other side, do not disagree that Catholic Charities Bureau is motivated by a religious purpose. The question is just whether that is so outweighed by the nature of their activities here that they can't be considered to be their principal purpose. That's not why they're being operated, why these activities are being carried out. Yeah, I guess I was asking you a little bit less about this case and a little bit more about, like, the test we would have to formulate or the principles that we would have to use in deciding this case. Yeah, and I think that the things that we think you would be looking to is the sincerity and principality of the religious beliefs. And so somebody asserts that our beliefs are religious, and this court has repeatedly said that it is okay to determine whether those are sincerely held. You're right, courts don't want to say that that's not sincerely held, but sometimes they have to get into it. And this court looked at that in Ramirez, the case about the prisoner on death row who wanted to be able to have a pastor in the execution chamber, being able to lay hands on him. And the court recognized that it was okay to analyze whether that was a sincere religious belief. And we think that the test here, the statutory test that we would apply, is similar to the one that the IRS has applied in the 501c3 context. And so I think that the Wisconsin Supreme Court was correct to recognize that analogy, but we think that it misapplied those cases that it was drawing from in the 501c3 context. You just said sincerity and principality of the religious belief? In here, that's because it has to be operated... What's the second? Explain what you mean, because that sounds a little... Well, here that comes straight from the statute because they're operated primarily for religious purposes. The question is whether this is the principal reason, the fundamental reason, the first of all reasons for why the organization is being operated. And so here we get that from the statutory test. A lot of religious exemptions in statutes are defined in those terms, and that is what is happening in the 501c3 cases where the IRS has been looking into whether you are principally motivated by religious purposes or you're running one of the cases that's discussed is actually a vegetarian restaurant, to go back to the Chief Justice's hypo. And the court concluded there that from the entire situation and all of the... Sorry to interrupt, but if it's sincerely motivated in part by a religious belief, that's going to be a tough, really tough inquiry. That question is whether the operations are, whether they are primarily for religious purposes. And so there the ultimate decision was that there was too much commercial flavor. And so all of these are non-profits. That's one answer to your question, Mr. Chief Justice, is that the fact that you just opened a restaurant and say this is consistent with our religious beliefs, if you are making a lot of money as a restaurant, you're not going to qualify as a non-profit organization. On the discrimination grounds, why would we have to get into any of that? There's no dispute that Catholic charities exist primarily for religious purposes. There's no dispute about the sincerity of their religious belief. And the only question is whether it's treating different religions differently because some proselytize when they provide services and others don't. Wouldn't it just be that simple? I agree with all of that. I think that the biggest problem with it is that it grants what we think is a wrong reading of the verbatim statute of a federal statute. Maybe you can get there under the statute as well with that. But it doesn't seem to me we have to engage with any of these other difficult questions. I mean, I had on a circuit court a difficult question about sincerity, whether somebody sincerely believed that marijuana was a god or whether he was a drug trafficker. That one turned out to be easy to decide. And I was going to say, Justice Gorsuch, that that's part of the inquiry in looking into sincerity. But it's not an issue here. No one disputes that Catholic charities was primarily created for religious purposes, and no one disputes the sincerity of their religious beliefs. It's just not on the table, right? That is correct. But we also think that there shouldn't be a dispute that it is operated primarily for religious purposes, because what the court should not be doing is looking at particular activities and defining them as inherently secular or inherently religious. That's the discrimination problem. That is a similar problem even for purposes of construing the statute. Mr. Gannon, can I return you to the construing the statute problem? I guess I understand that you're worried that because the federal statute is worded exactly in the same way, that a constitutional holding here might call that into question. But why? May I finish, Chief? Sure. But why would that be so? Couldn't we say in an opinion? I mean, because it's hard for me to see, frankly, in the Wisconsin Supreme Court's opinion, that it thought its reading was compelled by the federal statute. It kind of looked to it. You know, it observed that there was similarities. But it's hard for me to see how it wasn't interpreting its own statute. So just grant me that. If we did that, why would it necessarily call the federal statute into question? Because couldn't we just say Wisconsin has interpreted its statute this way, drop a footnote. You know, the Solicitor General of the United States has represented that the federal government statute is interpreted differently. I think you could do that. The Wisconsin Supreme Court thought that the Wisconsin legislature was conforming to the federal law because everyone wants to be part of the same team.   Spot me that I disagree. And if I did, why would it necessarily call the constitutionality of the federal statute into question, assuming that we held that there was a problem with this one? I think if you made that type of reservation, then we would surely insist that you had not decided that the federal statute was unconstitutional, because it wouldn't need to be construed that way. I agree with that. Okay. Thank you. Thank you, Counsel. You want us to focus on the federal statute. How would the statute apply to things like religiously operated hospitals, Catholic hospital, Presbyterian hospital? It's the same analysis where you would be asking whether the organization, whether its operations are primarily for religious reasons. And so you would be asking the hypothetical about orphanages that's in the legislative history, we think is not clearly carved out of the federal statute, because there's a debate about whether that is actually controlled by the church. So if you are talking about a hospital that is actually controlled and supervised by a church, and it is doing its activities principally for religious reasons, then we think that it would be able to qualify. And would it be a sufficient religious reason to say that the principles of the church require care for the sick? I think that... Well, as in this case, where the position of the church is, that caring for the poor is part of the religious mission. That that is the purpose of the activities is in service of those religious goals, and that is the principal reason for which they are operated.  Thank you. Justice Thomas? But wouldn't that be a bit more complicated if it... It's one thing if the church, if the diocese control the hospital, right? It's another thing if it's set up as an entirely different organization, run, again, by religious people, say nuns, but it's its own entity, and it doesn't report directly to the chancery. Yes, and that's what I said was in the legislative history that Justice Jackson was bringing up under the statute, potentially the distinction for the orphanages that are discussed in the committee report, is if they are not actually directly controlled and operated by the church, then that would be the reason why they fell out, and Justice Jackson was referring to that phrase which talked about church-related charitable organizations, but that doesn't necessarily mean that they are, in the sense of the text of the statute, supervised, controlled, or principally supported by the church that's at issue. So how is that different from Catholic charities here? The difference here is that there's no dispute that they are supervised, controlled, and they're not direct or operated. The first three verbs directly apply here. Everybody understands that the Catholic Charities Bureau supervises the sub-entities that are at issue here, that the bishop is two levels up, that he appoints the membership, and that the principles that control Catholic Charities Bureau sub-entities are that their employees follow Catholic social teaching, that they are providing services of poor and disadvantaged to be an effective sign of the charity of Christ. All of that is part of the religious purposes that flow all the way down to the sub-entities. Justice Alito? Justice Sotomayor? Justice Gorsuch, any further? You'd have us reverse, correct? Not just vacate and remand? I think, yes. If you wanted to do it on the statutory ground, I think that you would tell the Wisconsin Supreme Court that it was wrong to think that it was conforming the state statute to the federal statute. It would then be free to make a different decision on statutory construction on remand. And you could call that a reverse and remand for further proceedings consistent with your opinion. That's the boomerang problem Justice Thomas talked about, but on the constitutional side. On the constitutional side, then reverse, yes. Justice Kavanaugh? I think your answer to the Chief Justice on the hospital question, I think you answered it, I might be wrong, by just saying if, if it were operated primarily for religious purposes, then it would qualify. But that's the, I think the hypo was assume that the hospital is operated for religious purposes. Yeah, and you said, well, if it is, then it would qualify. Well, yeah, and I was trying to say that there are two different categories of analysis that I've seen that seem to read on that. And one is the committee report issue that Justice Jackson was talking about, where I was trying to draw a distinction between church-related and church-controlled, supervised, et cetera, as reflected in the text of the statute. And you asked my friend whether the committee report really just isn't consistent with the text of the statute. I think that the committee report is ambiguous in that regard, and we wouldn't read it as saying that something like an orphanage would be categorically incapable of being covered by the exemption. Assume we're past that point. And then the other cases that I've seen, I'm not aware of what the IRS has done with respect to hospitals in the nonprofit context in applying the same type of analysis that we have here. And so I think that in a case like this, it looks to me like it's easy to apply, but I'm not sure. So when you say a case like this, a case involving the services that are actually provided here? Yes, with a type of agreement about what the religious purposes are that are underlying this. And as I said, we think that... Then you're in a world, and we don't have to get into this, as Justice Gorsuch rightly says, but then we're in a world where we're distinguishing the services that are provided, which I thought is something we... Well, I think there's a lot else in the context of, you know, what else the hospital is doing, who it's competing with, how it provides the services. If it is actually, you know, in competition with commercial hospitals, then that is one of the things that was considered in the Living Faith Seventh Circuit decision about the vegetarian restaurant to say that there is an aspect of commercialness to the activity that ends up overwhelming the fundamentally religious purpose here. Thank you. Justice Barrett? Justice Jackson? And so I guess... I guess I thought this case was about the meaning of primarily for religious purposes and was not about the other part of the exemption, which relates to the operation and control of a church. And so that's why I looked at the committee report, which is very clear that it was suggesting that the orphanage, separately incorporated, would not be considered to be primarily for religious purposes. It does not say it would not be considered to be operated and controlled by a church, which was your answer. But setting that aside, can I just focus you for a second on... I just have a couple quick points on the statute and your reading. You say that we should read the statute as purpose being religious motivation. And as far as I can tell, purpose doesn't always mean that. So, I mean, purpose can mean many things. It doesn't necessarily mean motive, certainly not unambiguously so. It can mean the ends to be accomplished. It can be fulfilling a particular need. You know, my pen serves a purpose. It allows me to write notes, and that has nothing to do with motivation. And so I guess I'm wondering whether the ambiguity in what the statute means when it says for religious purposes doesn't invite us to consider what Congress was actually trying to do when it was drawing this exemption. Well, I certainly don't disagree that a purpose includes something, you know, the end to which something is directed. And if you look at the dictionary definitions that we quote on page 15 of our brief, we include a definition for purpose that is like that. And I think it dovetails well with the definitions for operation, which ask what is we are carrying out a principle or an undertaking to an end. And so the end is the purpose, and the end here, according to Catholic Charities Bureau, is to be an effective sign of the charity of Christ. No, I understand. I understand that that is a version of purpose that is relating to their motivation, which is to be an effective sign of the charity of Christ. But there's another idea of purpose that would be what is this organization's activities about? What are they offering? And I guess my concern is that that view of purpose seems to make more sense of the exemption in this case. I mean, if the entities, if the two hospitals, the Catholic hospital and the secular hospital, are performing the same services, I don't understand why one would be exempt just because they have religious motivation versus the other. I don't know what the statute is doing to make that kind of distinction. And this gets back, I think, to the beard-growing, tea-drinking example that I was talking about, to say that we don't think court should be in the business of saying that a particular activity is inherently religious. No, no, no. It doesn't at all. No, what I'm saying is if you are right that the line that's being drawn here is about motivation, I don't understand how the exemption works. There must be some rational reason why Congress would want to exempt the exact same kinds of services being provided just because they're being provided by somebody who's religiously motivated versus the restaurant. We have two identical vegan restaurants. One is being run by people who say this is a tenet of our faith and we're doing it in order to be a ministry for our religion, and the other is run by a person who has no such motivation. Why would one rationally be under the unemployment exemption and the other one doesn't? If you instead think of purpose as not motivation, if you think of it as the actual services that are being provided and the distinction is in that, then Wisconsin says the reason why we're exempting novitiates is because if we don't, we're going to get entangled in religion as we try to adjudicate those kinds of claims. It only makes sense if purpose is focused on the activities rather than the motivation. And I think that the fact that it is a religious exemption means that it makes sense to focus on what is the motivation for the acts that you're doing. Even though we have another prong that says it's church-related, and that seems to take care of this is being motivated because a church is doing it. But this is in addition to that. It not only has to be supervised, operated, supervised, or controlled by the church, but it has to be done primarily for religious purposes. I understand. Thank you. Thank you, Counsel. Mr. Roth? Mr. Chief Justice, may it please the Court. This religious accommodation solves a particular problem posed by the unemployment insurance system. When determining benefit eligibility, the state must often resolve disputes over whether an employee was discharged for misconduct. If so, no benefits. Now consider churches and their affiliates whose employees express and inculcate religious doctrine through worship, proselytization, and religious education. For those employers, misconduct disputes could often force the state to decide whether employees complied with religious doctrine. So Wisconsin gives those kinds of employers a wide berth by prophylactically exempting them. But because exemption means employees lose state unemployment insurance coverage altogether, exemption is limited to the employers most likely to draw the state into doctrinal disputes. So Wisconsin's search for worship, proselytization, and religious education, much like the ministerial exception, thus does not decide what is religious in the abstract, nor does it discriminate among denominations. Instead, these activities are what reasonably limit the exemption to the employers most likely to pose entanglement problems. Petitioner's motive-only test has no such limits. It would leave potentially over one million employees nationwide without unemployment coverage, like nurses and janitors at religiously affiliated hospitals, even though the state could virtually always determine their benefit eligibility without confronting religious doctrine. And petitioner's view that the First Amendment requires a motive-only test would radically expand similar exemptions like 501c3, Title VII, Section 702, and property tax exemptions, all of which examine what organizations do, not simply their motives for acting. Petitioner's theory ultimately leads to an all-or-nothing rule, exempt all religious groups or none. Such a rule could incentivize legislatures to cut back on religious accommodations altogether. I welcome your questions. If Catholic charities reported directly to the bishop without being a separate corporate entity, would you be here? If they're incorporated as part of the church, they would qualify for the church exemption. What's the difference? If the function is exactly the same, but it's a separate entity, what's the difference, religiously? The functions, obviously, are the same. What we are recognizing here is that sometimes the state makes accommodations, especially for churches, because we want to give churches a very wide berth. I think that's entirely appropriate for states and legislatures to do. That's in the Internal Revenue Code. In many places, churches receive special exemptions. Yes, in certain circumstances, you will have differential results based on how religious organizations... But if that's true, it puts a lot of pressure on a church's organizational choices. Why isn't that in real tension with our church autonomy cases? I think the church autonomy doctrine until this point has been very narrow. As we argue in our brief, it's limited to instances of state compulsion. You see Kedroff in Serbia, and that was about the state telling the church who should run it, how it should be organized, through a state statute or through judicial review of an ecclesiastical judicial body's decision. That's compulsion. None of this court's cases, and then I'd also point to Our Lady in Hosanna-Tabor, where Title VII remedies could include reinstatement of the terminated employee. That's the state telling the organization what it must do. I get the idea that there's compulsion and there's an incentive structure, but the incentive structure can be set up so that it becomes an extremely pressured choice, which basically, even although not facially, forces the religious organization into a certain choice. Understood, Your Honor. I think we're nowhere near that here, as we point out in our brief, and this is precisely because Catholic Charities relies so heavily on their backup cup private system. Because they're a reimbursable employer for the state, we think that the fiscal impact they face here is essentially net neutral. Either they're paying for benefits through the state system in a one-to-one reimbursable ratio, or they're going to pay for the benefits through their private system. But doesn't that cut the other way, too? Because one of the arguments your friends make on the other side is the benefits that individuals receive will be just as good or better than what the state provides. So that kind of goes to the compelling interest. What compelling interest does Wisconsin have in insisting on, effectively, Catholic Charities to be incorporated differently than it is? Well, I would note that the compelling interest analysis only comes in when we get to structure. I'm well aware of that, and I know you are, too, counsel. But what interest does the state have in effectively saying, You should be incorporated together with the church. Absolutely not. So the first premise, of course, is the state has a strong compelling interest in as broad of unemployment insurance coverage as possible. Now, it's true, Catholic Charities has a private backup system, but there's nothing in their argument that requires them. And you think it's just as good as what you need to have in Wisconsin? I would disagree with that, respectfully, Your Honor. I think the most important point is that it's essentially a self-insurance program. And so when you have layoffs, self-insurance is a risk in that situation. Oh, self-insurance. Governments are at risk, too. But, okay, anything other than that? There's also no due process protections. And so, obviously, if the employee is denied coverage in the private system, there's no judicial review, which you have in the state system. You said in your opening that we should look at what the organizations do and not why they do it. Correct. But how do you square that with the language of the statute, operated primarily for religious purposes, which seems to go to the why they do it, not what they do? So just with the brief premise that we don't think this is a Michigan v. Long situation where the state court's interpretation is properly before this court, operated primarily for religious purposes is a term of art. It's borrowed from the tax law context. This is not something that Wisconsin pulled out of the ether. This is a term that's long been used in 501c3. And we think under 501c3 case law, it's long been understood that operated looks at activity. So 501c3 has an organizational test and an operational test. And the operational test is always used to check what the organizational purpose is. And so we think the only way that operational test has any effect is if you're looking at the activities. And I point to the living faith case because this goes to the chief's question. I see no way in which living faith came out the way it did, which is deny the exemption to the Seventh-Day Adventist restaurant, if a religious motive is enough. Because the Seventh-Day Adventists and living faith said, for us, promoting health is an element of the gospel. Health leads to salvation. I think that's practically indistinguishable from what Catholic Charities is saying here. And living faith said, no, I'm sorry. The commercial, simply because you have a religious motivation for the non-exempt purpose, does not render you eligible for the exemption. I'm sorry, go ahead. Go ahead. What is the simplest thing that the Catholic Charities would have to do to qualify for the religious exemption in Wisconsin? Should they have one sign in the dining hall saying, this meal provided by Catholic Charities, if you want to find out about the church, here's a brochure? No, Your Honor. I think what we're looking for is precisely what this court looks for in adjudicating the ministerial exception. We're looking for activities that express and inculcate religious doctrine. Worship, proselytization, religious education. And it's precisely because it's those activities that create the entangling problem. What is proselytization? Proselytization would mean when the Catholic Charities, when it's delivering services, says, you know, please repent, essentially. Repent. They have to say repent. Anything like, you know, please join our religion. We would like you to become Catholic if you're going to receive this service. Sorry, Your Honor. So they have to say repent. I just want to know what the test is. So repent your sins. You get the exemption not requiring you to repent your sins. I guess you don't get the exception. Or what was the other one? What was the other test for proselytization? Join our church. Become a member. As opposed to we welcome you to attend our services if you want. Here's some information about them. What's the line there? Because they say they do. They say, you know, you're always welcome. I mean, Catholic Church, we'd love to have you. We're not saying you have to show up. So is mandatory church attendance versus optional church attendance? That's the line? No, Your Honor. I think what we're looking for is analogous to what this court looks for in applying the ministerial exception. What it wants to know when it sees you. I'm asking you how to apply your exception. Because the Wisconsin Supreme Court says proselytization is really important. And it says, oh, also, if you serve non-coreligionists, that's a problem. So I guess you only serve those who are coreligionists. That's one solution, I guess, for the church. Don't help anybody else in need. And the other is to proselytize. And I'm just trying to get my hands around what that means. So I will say the serving of coreligionists is a marginal factor at best. A marginal factor. If this court wants to discard it, we have no problem with that. Well, it's in the court's opinion. I understand. So you're running away from the court's opinion. So it all comes down to proselytization. How much is enough? No, Your Honor. What it comes down to is whether the employees of the organization are expressing and inculcating religious doctrine. Do you think that Wisconsin could pass a statute that says we'll give a religious tax exemption to religious groups that proselytize but to no others? I don't think so, Your Honor, because I think that would not be serving any particular purpose. I don't understand why it's not the exact same thing. I mean, the way the statute has been interpreted by the Wisconsin courts, it's basically saying we're giving the tax exemption to religious organizations that proselytize but not to religious organizations that don't. So I'd like to step back for a moment to the principle that accommodations are meant to solve particular problems. And we think the world is roughly divided into two groups. It's religious organizations that are there. Some religious organizations proselytize. That's right. And some religious organizations are allergic to proselytizing. And for the Wisconsin, I posed the hypo where it was the Wisconsin legislature. This is instead the Wisconsin court. But instead saying the tax exemption goes to religious people who think of proselytizing as part and parcel of their religion and not to the religious people who think we don't proselytize even when we do all these charitable works. It's actually not what we do. And that's part of our religion. So what Your Honor is driving at, I think, is essentially this is an arbitrary distinction between religions that proselytize and those that don't. And there's no reason. And for those that don't, sometimes it is a religious principle not to. But I would dispute that premise that this is not an arbitrary distinction. I think it serves a functional purpose when employees are expressing and inculcating religious doctrine. We have to step back. The unemployment insurance system is going to turn on misconduct disputes. And if you're out there expressing and inculcating religious doctrine through those three things that I mentioned, it's going to be very difficult for the state to resolve an unemployment dispute. But you gave that away, though, when you said all they have to do is turn this into the Catholic Church Inc. And it all goes away. So you could adjudicate those disputes. And you would say it would be very important for you to do so because they don't involve proselytizing. But the minute it goes into the Catholic Church Inc. rather than a separate incorporation, so I'm not sure that argument works. Well, Your Honor, the legislature here, yes, has created this exemption to function on an organizational level rather than an individual level like the ministerial exemption does. But I think that's for a prophylactic reason. We don't want to have to go through sort of one-by-one, activity-by-activity to look at it. So, yes, Your Honor, there is an element of over-inclusivity when someone's inside the church, we're going to let them out. But, again, I think that's a virtue. States should be very careful about churches and stay away from them. And so that's what we've done here. It seems to me, and it's repeatedly in your brief and in your opening and in all these answers, you want a test that is the easiest one for you to apply. You're saying, this will make it easy for us. And it is easy here. And that's why you say, I don't want to get into the particular doctrine. We don't want to be dragged into trying to consider a number of nuances or whatever, whether this qualifies or not. You want the test to be whatever's easiest for you. I don't think that's quite right, Your Honor. I want the test to be the one that accurately identifies the kinds of organizations that are going to cause those entangling problems. I happen to think that it's a relatively easy-to-administer test if it focuses on those big three things. I think that's exactly what the ministerial exception looks for. It looks for those same three things to identify the employees whose employment decisions we want to stay out of in the anti-discrimination context. So it's not just the level of employees. Justice Barrett? Counsel, if proselytization or evangelization or whatever you want to call it is a necessary component in Wisconsin's view, I mean, as I understand it, Judaism does not have that as part of its religion. So does that mean that Judaism is completely disqualified from getting the exemption if they're running these sorts of organizations? My apologies, Your Honor. If I was not clear, these are ORs. These are not ANDs. So proselytization is absolutely not a required component to receive this accommodation. These are ORs. If your organization engages, I think, in any of these three things, worship, proselytization, religious education, you're going to be doing the kinds of things the state needs to stay away from, whether it's in the anti-discrimination context or whether it's in the unemployment context. So to Justice Gorsuch's question, if they don't proselytize, that's fine. They may still get this accommodation if they do other kinds of things that are going to create these entanglements. Like serve co-religionists? I'm just trying to figure out what. I mean, let's say that you want to serve people that aren't co-religionists. You're still defining it in a way that will inevitably exclude certain religions. Sure. So the co-religionist piece of the decision, I'm not going to stand and die on that hill. If this court wants to say that's not a proper consideration, I think it's still sufficient to affirm the decision below. The core of the state Supreme Court's decision was a motive alone is not enough to qualify for this exemption. Catholic Charities here relied entirely on their motive. We think affirming that core of the decision suffices to deny them the exemption. I think it has to come down to proselytization for you because worship, you know, you're not forced. Some faiths will force you to sit through the worship before they give you the soup. Others just give you the soup and invite you to worship. So, again, that's proselytization in another way of looking at it. Isn't that right? If I may, Your Honor. Is Wisconsin going to go around and this soup kitchen, you know, you have to go to the service before you eat. They're good to go. But that one, they just invite you to the service after the soup. They're bad. Really, I would have thought this would entangle the state in religion a whole lot more than a nondiscrimination rule between religions. So I'd like to revisit just very briefly because I think it's directly responsive to Your Honor's question. The hypothetical we gave in our brief, I think it illustrates this point. Ministerial exception. Imagine Catholic Charities on one hand and we'll call it Evangelical Charities on the other. The Evangelical Charities worships, proselytizes, educates its service recipients. It's chock full of employees who receive the ministerial exception precisely because they perform those functions of expressing and inculcating doctrine that the state needs to stay away from. Catholic Charities, however, is not going to have employees who receive the ministerial exception. So we have the same exact disparity.  There are no nuns and priests and deacons at the soup kitchen? I'm not saying that at all, Your Honor. But if they are not when they are delivering. The bishop, you know, is overseeing it? Right, Your Honor. It's not about who the employees are. It's about how they work. It's about what they do. The ministerial exception, it was about who they are. Well, sure. Yeah. But I apologize. What I meant is it's not their status as a minister, a deacon, or a bishop. It is about what they do. And so if the minister, the deacon, or the bishop at the soup kitchen is when he delivers the soup, is doing the things. But the nun doesn't get the ministerial exception and neither does the priest? Sorry? The nun and the priest don't get the ministerial exception? So I suppose they would because in other contexts they would be there to express and inculcate religious doctrine. But in the context of this, they're employed by Catholic charities. And in the course of their employment with Catholic charities, they're not there to express and inculcate the faith. So you're not entangled if you have to go in and interview the nun and the priest who go in and do a shift at the soup kitchen that Catholic Charities is running to see what they're doing? Or if you have to listen, I mean, are they playing like hymns on the radio or like Christian rock at the evangelical soup kitchen on the radio? You know, is that proselytization or not because you're forced to sit there and listen to it? Your Honor, I understand the thrust of the question. But I mean, I don't think it's any more entangling than the kinds of questions courts have to answer all the time when applying the ministerial exception. Mr. Roth, why don't you just apply the ministerial? I mean, this goes back to the Chief Justice's question. It just seems as though Wisconsin says we're going to set up the system that is operating in a discriminatory fashion based on whether or not you proselytize to avoid having to address the ministerial question if it should arise in these situations. But I mean, if it's creating a constitutionally problematic discriminatory front end issue, why don't you just deal with it as the ministerial exception in the back end? It's not as easy, says the Chief Justice, but so be it. Well, of course, disputing the premise that this is a setting of a discriminatory exemption. I think the point is this is a prophylactic. And the legislature has said rather than force these kinds of organizations in individual cases to assert something analogous to the ministerial exception, which it can be challenging to predict who's going to get this, we want to get these people out on the front end. I think that's very similar to what Congress did when it expanded Section 702. In pre-1972, it only applied to religious activities. But then Congress said, well, that's going to require religious organizations to sort of predict on a one-by-one basis who's going to get this 702 exemption. So we're going to expand it to religious organizations as a whole. And Amos said that is entirely appropriate. It's good to have these prophylactic measures to give space to the organizations that do these things, rather than force them sort of on a one-by-one basis to have to adjudicate these sort of ministerial exception type defenses, which are affirmative defenses in these, for instance, the Title VII case. I think your overarching argument, again, is that we shouldn't look at the motives. We should look at what they do. And the other side says, no, you have to, by the statutory language and constitutional principles, look at why they're doing the activity. And they say the limit on that is to prevent some of the absurd hypotheticals or extended hypotheticals is sincerity. And sincerity will weed out the cases that they're worried about. What is your response to why sincerity? You should look at beliefs, look at purpose, motive, but sincerity will weed out the marginal cases. Well, sincerity – so I took two hypotheticals given to the other side as examples of the edge cases that maybe we don't want to be exempting here. One was the hospital, and one was the vegan restaurant. I think in both those cases, you're not going to weed those out on sincerity grounds. There's testimony in the record here. This is Record 99 of the lower court record. And the Archbishop of Milwaukee testified that he oversees multiple Catholic hospitals in the Milwaukee area. And so they're clearly operating for a religious motive. We would never dispute the sincerity of that religious motive. They're going to be out. Seventh-day Adventists, similarly. Maybe it's commercial activity they're engaging in. And they're going to be out. Why? Just explain that. They're going to be out because when they run their vegan restaurants – I think you're on the hospital one. Oh, the hospital? Well, they're out because what the hospital is saying is if it's supervised by the bishop, which is all this statute requires, the bishop will say the reason we run these hospitals is to serve – Christ healed the sick, and we're doing the same. And so how can you tell us that that's not a religious purpose? They'll be out, even though 99.9% of what goes on at that hospital is healthcare. And what's your response to that? That they should be in? I'm just trying to get at the analysis you would use on the other side of that argument. Well, my analysis would be you're looking at the activities. And as Seventh Circuit said in Dykema, we want to look at whether the kinds of things that Catholic hospital is doing is going to entangle the state in unemployment benefit disputes. And I think the answer is clearly no. So I'd like to illustrate two very brief hypotheticals to illustrate this sort of entanglement point. I'll just stick with one, actually. So the nurse at the hospital, she's not charged with inculcating religious doctrine. She is fired from malpractice. There's a misconduct dispute. The state can very easily resolve whether she engaged in misconduct without answering doctrinal questions. But if they're right, she's out of the system altogether, and she loses benefits. And that's a needless loss of benefits. I mean, Mr. Roth, let's suppose we affirm. I mean, Catholic Charities comes to the state and says, okay, fine, we don't like the decision, but we want to comply. Tell us the minimum change we need to make in order to comply. What's your answer? I think if when they deliver, say, the soup to the recipient, they say, recipient, we're both going to say the Lord's Prayer. That could be one thing. That would be sufficient. You don't get the soup unless you pray first. And again, I think it's because that type of job function is tethered to religious doctrine. And so that's exactly what creates the problem. If there's a termination decision, if the soup kitchen person says the Lord's Prayer, say the wrong way, he omits a line, and he's terminated for that, however unlikely that may be. But if it were to come to pass, the state agency would now have to decide, did he omit too much of the Lord's Prayer? Did he say it the wrong way? But it might be a matter of religious doctrine that we don't require people to say the Lord's Prayer with us before we give them soup. I mean, what's problematic about this? I mean, there are lots of hard questions in this area, vegan restaurants, hospitals, lots of hard questions. But I thought it was pretty fundamental that we don't treat some religions better than other religions. And we certainly don't do it based on the content of the religious doctrine that those religions preach. And this opinion sets up two things. One is the co-religionist service. You've run away from that. And the other is the proselytization. Some religions proselytize. Other religions don't. Why are we treating some religions better than others based on that element of religious doctrine? Because precisely because I think when an employee has to proselytize, that's what creates the problem. I draw just a brief comparison. The problem must be, you must be able to address this problem, which is, you know, entanglement is an issue. If I say to you, you know, you have to figure out a way to do this that does not discriminate among religions based on the content of their doctrines. So I would draw an analogy. The reason why we're so worried about entanglement is because it gets us enmeshed in the content of religious doctrine. But your way of doing it, you know, basically puts the state on the side of some religions with some doctrine versus other religions with a different doctrine. I think a very apt analogy on this point are the FICA and ACA exemptions. These are very valuable exemptions to the FICA taxes and the ACA individual mandate. There are exemptions for those who have religious objection to participating in public insurance. Not all denominations have that religious objection. And so it does fall in denominational lines. Who gets the FICA exemption? This is a very valuable exemption. Only certain denominations that have these kinds of objections to public insurance are going to receive this. Yes, but all can. And here the difference is all cannot.  There are going to be some exemptions that as a matter of Catholic Charities does more soup kitchens than some other faiths. It's true. It's true. That's true. So they're going to get more likely to get the exemption. But I think what Justice Kagan's getting at is, isn't it a fundamental premise of our First Amendment? The state shouldn't be picking and choosing between religions, between certain evangelical sects and Judaism and Catholicism on the other, for example. And doesn't it entangle the state tremendously when it has to go into a soup kitchen, send an inspector in to see how much prayer is going on? On the discrimination point, my fundamental premise is there are certain circumstances in which religion A faces a problem based on its doctrinal content or its practices that religion B may not face. And so when the state legislature, Congress or state legislatures set out to exempt religious group A but not religious group B precisely because B does not face the problem, that cannot be discriminatory. We're in a world then where there's no line drawing available to legislatures to accommodate specific problems that only specific religious groups face. Because the principle is if that ever falls on denominational lines, it's unconstitutional. And, Justice Gorsuch, I actually dispute the premise of your question that it's easy for a religious group to adopt a new principle to obtain the ACA or FICA exemption. All they have to do is reincorporate, according to you. No, on the FICA and ACA example, the premise would have to be the denomination that's left out gets a very valuable exemption. All it has to do is adopt a new tenant of religious doctrine that I don't like to participate in public insurance. And it gets the exemption. But that's obviously not so simple. We don't go around telling religions you should adopt new tenants in order to get a new benefit. And so I really think it's basically the same dynamic that we face here. It's certain groups face the problem. Certain groups have conscientious objections. Other groups don't. That may fall on denominational lines, but that's something we've always done. I'd encourage you to go back the history of this. Professor McConnell, his canonical article on the free exercise clause recognizes that at the founding of this country, we had multiple targeted religious accommodations for oath-taking, for religious assessments, for conscription. And those often were limited to religious groups known to be opposed to those things, especially the oath-taking and the Quakers. Counsel, can I shift you to what I hope will be an easier question for you? Do you want to address your disagreement with the Solicitor General about whether the Wisconsin Supreme Court's decision tracks the interpretation of the federal statute? You want me to address the Michigan v. Long question? Well, yeah. You say we should not decide it on that basis, so you're distancing yourself from the position taken by the federal government. Can you talk about that? Right. So on the Michigan v. Long question, I think it's a very simple distinction. So in St. Martin, what was going on is the South Dakota state court thought it was required to bring its coverage up above the floor that FUTA sets. So FUTA sets a floor. If you fall below it, you don't qualify for the federal state tax sharing. So South Dakota thought, we're trying to get up to this floor so we can get the credits. So that's why the South Dakota court said, I'm required to do what I'm doing by FUTA. That is not what's happening here. The state court did not think it was required to meet a floor. And so that's why Michigan v. Long doesn't apply. There's sufficient independent state consents. It's an optional exemption. I think the Solicitor General recognizes that. States don't have to have this. I believe the state of Oregon does not have any part of this exemption at all for churches or religious purpose organizations. And so precisely because it's an optional exemption, Wisconsin can go above the floor of FUTA. It's not a compelled reading, and so Michigan v. Long doesn't apply. I see my red lights on, but I am happy to continue if you'd like. Thank you, Counsel. Rebuttal, Mr. Rossbach? Oh, I'm sorry. I'm happy to stand up or sit down. Chief, whatever you want me to do. I didn't have any more, so I figured we could. Justice Thomas? What would we do? You seem to focus on the proselytizing aspect of the exemption, that you could get the exemption if you proselytize. But, you know, it leaves me to wonder why you don't have the same attitude towards someone who posts outside. We believe deeply in the corporal works of mercy. Why is there a difference from your standpoint in one and not the other, proselytizing over the corporal works of mercy?  And it's precisely because the Catholic Charities employees, when they perform the corporal works of mercy, which I want to be unequivocal, the state recognizes that charity is an essential aspect of the Catholic religion. We are not disputing that. But when the employee is simply performing the corporal work of mercy without expressing an inculcating religious doctrine, this is the point, this is an anti-entanglement statute. And so if they're not expressing an inculcating religious doctrine, they're not going to create the entangling problems. And so that's why we say they should still be covered, because we're not going to face the misconduct disputes that are very difficult for the state agency to resolve. So what do you mean by an anti-entanglement statute? It's an anti-entanglement statute precisely because when the state has to resolve misconduct disputes over benefit eligibility, we don't want our hard-working public servants to have to answer questions of religious doctrine. I'll return to my Lord's Prayer example, whether they said it correctly. We want to keep them out of that type of decision-making, and that's why that kind of activity triggers this exemption. Where does this standalone entanglement issue come from? Well, it's what's driving this statute, Your Honor. It's what's led to the types of activities the state has. I know, but when I think of entanglement, I think of the hopefully defunct Lemon test. Where does it come from as a standalone consideration? Well, I think Lemon built in, entanglement predated Lemon. I believe Waltz is one of the first cases where it really was discussed as a factor in First Amendment doctrine, trying to avoid an establishment clause context. That's right. Justice Levy? Are you aware that this entanglement problem has arisen in states that follow federal law? And by follow federal law, you mean? Interpret the federal statute similar to the federal statute, similar to your statute. Have they had a lot of entanglement problems? So we're talking about states who take a motive-only approach?  Well, they would be exempting much more broadly, so I think no. They would not have the enforcement entanglement that we're concerned about here, precisely because many more organizations are exempted. So you don't actually have any? You think there would be an entanglement problem if the Wisconsin Supreme Court interpreted Wisconsin law the way the Solicitor General tells us federal law should be interpreted. You have no examples of actual entanglement cases coming up. Well, no, Your Honor. I do think if the Wisconsin statute were interpreted as the Solicitor General requests and it was simply a motive-only test, there is less entanglement, absolutely. But we think that goes far beyond the purpose of this statute, which is to get the state out of entangling employment benefit disputes. You're going to exempt the hospitals with all the nurses, all the janitors, who aren't going to pose these problems. So it simply takes us far beyond what it's meant to do. All right. Thank you. Justice Sotomayor? How much problem is there in Oregon that doesn't give this exemption at all? I'm not aware, Your Honor. I'm not aware. Is it because if you have an as-applied challenge to the janitor being fired, if the janitor is not exempt, the state's not going to fight it if it doesn't have a religious reason for firing him or her, correct? Well, that's true, but if there is a religious, you know, a religious violation. But it's not going to be for most people. The proselytizing is usually not – if the proselytizing causes a problem, then the state is not going to get involved, correct? Well, that's the million-dollar question. I mean, that's what this exemption is meant to do. I know you don't like this question, but accept it. If we find that your refusal is – constitutes denominational discrimination because the motive is being judged – the motive is being judged on religious grounds, do you survive strict scrutiny? I think so, Your Honor. How? We found denominational discrimination on the 50% rule in Larson. This seems very similar to that. And next, we applied strict scrutiny. So how are you different? I know there was invidious discrimination, but I, for one, don't think that was the reason. How do you survive? Well, Larson, when we looked at the 50% rule, I think what this Court said is that's essentially inexplicable for any other reason than an intent to disadvantage up-and-coming new religions. And we think that's nothing like the line the state court has drawn here. We think it's an effective line that has divided the world into groups most likely to pose entangling problems and those that are not. And so unlike Larson, our line does something secular, something positive from the religion clause perspective, avoiding entanglement. That's what just differentiates us from Larson. Thank you. Mr. Kagan? Justice Gorsuch? I can't remember. Justice Bergeron? Justice Jackson? Thank you, Counsel. Mr. Rosbach? Thank you, Mr. Chief Justice. A couple of quick points. First, I think my friend's argument showed that Wisconsin can't defend the decision below, which said, and I quote, the sub-entities, if they, quote, partook in activities such as those cited by the DICOMA Court, that's the Petitioners of Index 46A, that they would have been in a better position than they are now. So they're running away from that, and you heard that in the argument earlier. Their new interest in anti-entanglement is itself incredibly entangling, as I think the Court's questioning amply demonstrated. The reality is what they want to do is make what the Larson Court called at footnote 23, explicit and deliberate distinctions between religious groups. And that's just not allowed by the Constitution. You know, I'd also say that a lot of my friend's argument was a little confused because it really focused a lot on individuals versus institutions. This is about an institutional plaintiff. It's not about different individuals that are coming forward with, you know, the nurse or the nun, et cetera. This is about, you get the exemption as an institution, not individual by individual. You know, I'd say that the easiest way, I think, to decide this case is on the Larson and Lacoumi's ground of ensuring that different states do not discriminate along theological lines. You know, in the end, this is a religiously pluralistic society, and that calls for a generous approach to religious exemptions, not a stingy one. And, you know, Catholic Charities is an integral part of the Catholic Church. It's carrying out the mission of the Catholic Church when it helps all people, and penalizing them for helping all people without proselytization cannot be reconciled with the pluralism of American society or the religion clauses. We respectfully request that the Court reverse. Thank you, Counsel. The case is submitted.